FILED
2011 Aug-08  PM 12:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| **SHARON DORSEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:10-CV-1467-RDP** |
| | } | |
| **STONEBRIDGE LIFE INSURANCE** | } | |
| **CO.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment. (Doc. 32). The matter has been fully briefed. (Docs. 33, 37, 39). For the reasons discussed below, the court finds that summary judgment is due to be granted on the claims for civil conspiracy and ordinary bad faith, and denied on the claims for breach of contract and extraordinary bad faith.

## I.    STATEMENT OF FACTS

In March 2009, Plaintiff Sharon Dorsey became a widow after her husband of 38 years died at his home in Blount County. (Doc. 1 at 2). Prior to his death, Mr. Dorsey suffered from gastroparesis. (Doc. 33 at 2). As Mr. Dorsey's condition prevented him from properly digesting food consumed orally, he received sustenance through a parenteral port that allowed him to inject nutrition directly into his bloodstream. (Doc. 33 at 2-3).

Both the cause and manner of Mr. Dorsey's death are disputed in this case. But viewing the Rule 56 evidence in the light most favorable to the Plaintiff (as the court is required to do here), it appears he died after injecting a solution made of saline and Rolaids tablets into his parenteral port.

When the Coroner investigated Mr. Dorsey's death, he found a partially dissolved Rolaids tablet in a drinking glass filled with saline solution.  (Doc. 33 at 4).  The Coroner also noticed a pinkish substance on Mr. Dorsey's port and on a syringe found near the corpse.  (*Id.*).  A symptom of Mr. Dorsey's condition was frequent heartburn, for which he regularly took Rolaids tablets by mouth. (Doc. 33 at 3).  No one contends that Mr. Dorsey was ever advised that it would be safe to inject a Rolaids/saline solution into his port, but the Coroner concluded that was the cause of Mr. Dorsey's death.  (*Id.*).

After Mr. Dorsey died, Plaintiff submitted a claim on an accidental death policy Mr. Dorsey had with Defendant.  (Doc. 33 at 5).  In support of her claim, Plaintiff submitted the death certificate, a statement, and the Coroner's report that found Mr. Dorsey's death resulted from "[a]ttempted injection of antacid to combat stomach pain."  (Doc. 36 at 7; Doc. 37, Ex. D).  Defendant assumed the facts in Plaintiff's submissions to be true but nonetheless denied the claim on the grounds that the policy excluded injuries resulting from medical treatment and that the loss "was not caused by an accident due directly and independently of all other causes."  (Doc. 33 at 5).

Plaintiff contested the denial.  (Doc. 36 at 8).  Without doing any additional research, James King, the employee of Defendant who initially reviewed Plaintiff's claim, again recommended denial.  (Doc. 36 at 7, 8).  And again, Rhonda Caldwell, a claims manager working for Defendant, approved King's recommendation.  (Doc. 36 at 7).  During the same period, Ken Costa, another employee of Defendant, also reviewed and approved the second denial letter.  (Doc. 36 at 8).  The summary judgment evidence in the Rule 56 file shows that it is undisputed that King and Caldwell did not perform any investigation beyond reviewing Plaintiff's claim.  Nor did King or Caldwell perform any legal research by consulting *Couch on Insurance* or Westlaw (though they had access

to both).[1]  (Doc. 36 at 9).  In his deposition, King admitted that he did not think it was necessary to determine whether injecting Rolaids/saline solution into oneself is medical or surgical treatment, so he did not consult a dictionary to see the meaning of the terms "medical" and "surgical."  (Doc. 36 at 9).  Neither of the denials relied on the policy's drug exclusion, perhaps because King admittedly understood that exclusion as applying only to injuries involving prescription drugs.  (Doc. 36 at 20, 21).

On June 10, 2010, Plaintiff filed the case now before the court against Defendant and Aegon Direct Marketing Services, Inc.,[2] alleging breach of contract, bad faith, and civil conspiracy.

## II.    STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure and is the prescribed manner by which claims which do not involve genuine issues of material fact should be resolved.  *See* Fed. R. Civ. P. 56.  The parties need not agree on every fact; rather, the law requires only that the moving party show "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Whether a fact is material is determined by the substantive law applicable to a particular case.  *See Anderson*, 477 U.S. at 248.

---

[1] While it is true that neither King nor Caldwell did any legal research on their own, Caldwell did contact Defendant's legal department regarding the claim.  (Doc. 38 at 10, n. 2).  Defendant has invoked the attorney-client privilege, however, and the court is unaware of the substance of that opinion.  To be sure, Defendant "is not relying on advice of counsel" to defend their denial of Plaintiff's claim (*Id.*); therefore, the court cannot attach any material significance to the fact that Defendant sought a legal opinion before ultimately denying the claim.  In other words,"[D]efendant simply cannot use" privileged communications with its legal department "as both a sword and a shield."  *E.g., Ex parte Malone Freight Lines, Inc.*, 492 So.2d 1301, 1303 (Ala. 1986)(quoting *Garfinkle v. Arcata National Corp.,* 64 F.R.D. 688, 689 (S.D.N.Y. 1974).
[2] Aegon Direct was dismissed without prejudice on September 15, 2010.  (Doc. 15).

If the moving party shows that there is no genuine dispute of material fact, the burden shifts to the nonmoving party to provide specific facts to show the existence of a genuine dispute. *See Southern Solvents, Inc. v. New Hampshire Ins. Co.*, 91 F.3d 102, 104 (11th Cir. 1996). Although the nonmovant is entitled to justifiable inferences from the undisputed facts, he cannot rest solely upon his pleadings. Fed. R. Civ. P. 56(c). Furthermore, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice . . . [and] if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997) (internal citations omitted).

## III.   DISCUSSION

Plaintiff's complaint asserts claims for breach of contract, bad faith, and civil conspiracy. The civil conspiracy count is no longer viable due to the dismissal of Aegon Direct Marketing Services, Inc., which leaves Stonebridge Life Insurance Co. as the only Defendant in this action. Thus summary judgment on the civil conspiracy claim is proper. On that much the parties agree. The parties disagree, however, on whether summary judgment is due on the claims for breach of contract and bad faith. Accordingly, the court will address those claims below.

### A.    Breach of Contract Claim

A plaintiff may establish a claim for breach of contract by demonstrating "the defendant's nonperformance and damages." *State Farm & Cas. Co. v. Slade,* 747 So.2d 293, 303 (Ala. 1999). Where the contract at issue is an insurance policy (as is the case here), the plaintiff bears the burden in the first instance of proving that coverage is triggered. *Sphere Drake Ins., P.L.C. v. Shoney's Inc.*, 923 F. Supp. 1481, 1487 (M.D. Ala. 1996) (citing *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967)). Therefore, to defeat summary judgment, Plaintiff must present

-4-

substantial evidence that Mr. Dorsey's death was an accident within the coverage of his policy with Defendant.

Defendant contends that Plaintiff cannot meet that burden because she has not provided substantial evidence supporting the Coroner's conclusion on the cause of Mr. Dorsey's death. Furthermore, Defendant asserts that even assuming the factual circumstances of Mr. Dorsey's death to be as Plaintiff claims they are, coverage under the accidental death policy is not triggered due to the policy's medical treatment and drug exclusions.  For the reasons discussed below, the court rejects these arguments and finds that Defendant is not entitled to summary judgment on the contract claim.

### 1.        Plaintiff has presented substantial evidence of an accidental death

Defendant first contends that Plaintiff cannot present substantial evidence that Mr. Dorsey's death was caused by the injection of a Rolaids/saline solution rather than a natural death not covered by his accidental death policy.  This argument relies heavily on the Coroner's admission in his deposition that there is no medical evidence that Mr. Dorsey injected a Rolaids/saline solution or died of an embolism.  Further, Defendant contends that the Coroner's opinion on the cause of death is due to be rejected because it is little more than inferences upon inferences, which are impermissible under Alabama law.

The first flaw in Defendant's argument is an overemphasis on the purported lack of evidence supporting Plaintiff's explanation of Mr. Dorsey's cause of death.  While it is true that the Coroner admitted that no medical evidence exists to explain the cause of Mr. Dorsey's death, but he went on to explain that he understood the term "medical evidence" to refer only to evidence derived from an autopsy.  It is undisputed that no autopsy was performed on Mr. Dorsey because his body was

embalmed before one could be conducted, thereby destroying any "medical evidence" by the Coroner's understanding of the term. But to defeat summary judgment, Plaintiff is not limited to presenting medical evidence derived from an autopsy; she is only required to produce substantial evidence that Mr. Dorsey's death was an accident.

Here, Plaintiff has met that burden. It is undisputed that Mr. Dorsey's death certificate lists his death as an accident, and the immediate cause of death is listed as a "[p]robable acute cardiopulmonary thromboembolism" caused by "[i]njection of foreign matter into parenteral vein catheter." (Doc. 37, Ex. 1). Under Alabama law, a death certificate is prima facie evidence indicating cause of death, *Vulcan Life Ins. Co. v. McDuffie*, 331 So. 2d 280, 282-83 (Ala. Civ. App. 1976). Based upon the presentation of the death certificate, along with other evidence in the Rule 56 file, the court concludes that Plaintiff has presented substantial evidence that Mr. Dorsey's death occurred as described in his death certificate–that is, it was the result of an "[a]ttempted injection of antacid to combat stomach pain." (Doc. 37, Ex. 1).

Defendant contends that the cause of death on the death certificate should be disregarded because the Coroner's conclusion was the result of "inferences upon inferences," which are apparently prohibited under Alabama law. *See Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052, 1074 (Ala. 2006). In response, Plaintiff argues that Defendant misunderstands the rule against basing inferences on inferences. This all makes for an interesting academic debate, but the court need not decide the correct application of that particular Alabama rule against pyramiding inferences because it does not apply in this court. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (holding that the rule against pyramiding inferences is a matter of sufficiency of evidence, which is determined by *Erie* federal law). In federal court there is no "prohibition

against pyramiding inferences; instead all inferences are permissible so long as they are reasonable." *Id.*

With the proper standard for judging inferences thus defined, the court rejects Defendant's argument that the Coroner's opinion on the cause of death is "based solely on his speculation." Defendant admits that the Coroner's investigation revealed a partially dissolved Rolaids tablet in a drinking glass and a pinkish substance on a syringe found near the port that went into Mr. Dorsey's body. Further, for the purposes of summary judgment it is uncontested that the Coroner compared the substance in the drinking glass with that on the syringe and on Mr. Dorsey's port and concluded they were the same. Moreover, the Coroner tested that conclusion by dissolving a Rolaids tablet into a saline solution, which he compared with the substance on Mr. Dorsey's glass, syringe, and port both visually and using a laser in his laboratory.

A reasonable jury could conclude from such evidence that Mr. Dorsey dissolved a Rolaids tablet into a saline solution, which he then injected into his parenteral port. The Coroner testified that such an injection would likely result in death, and he was 99% certain on his conclusion that Mr. Dorsey died in just that manner. Accordingly, the court finds Plaintiff has presented substantial evidence that Mr. Dorsey did not die of natural causes, but rather an injection of a Rolaids solution into his bloodstream.

**2.      The medical treatment exclusion contained in the policy does not apply**

The medical treatment exclusion in Mr. Dorsey's accidental death policy issued by Defendant provides that no benefit will be paid for injuries "due to disease; bodily or mental infirmity; or medical or surgical treatment of these." (Doc. 33 at 2). Here, defendant contends that even if Mr. Dorsey did in fact die from injecting a Rolaids/saline solution into his parenteral port, that injection

is just the sort of "medical treatment" referred to in the policy's exclusions.  After all, it reasons, Mr. Dorsey's heartburn was a disease or bodily infirmity, and injection of the Rolaids was an (ill-advised) attempt to "treat" that disease.

The court is unconvinced.  Mr. Dorsey's policy does indeed exclude injuries resulting from *medical* treatment, but that term is undefined in the policy.  According to *Couch on Insurance*, the term "medical and surgical treatment" when used in accidental death policies means "that which is done by *a physician* of any recognized type or by *a surgeon* in diagnosing a bodily ailment and seeking to alleviate or cure it,"  including "those things done by the insured patient to carry out specific directions given *by his or her physician* for the purpose of effecting a cure or alleviation of his or her condition or illness."  10 Couch on Insurance § 141.91 (3d ed.)(emphasis added); *see also Brooks v. J.C. Penney Life Insurance Co.*, 231 F. Supp. 2d 1136, 1143 (N.D. Ala. 2002)(interpreting medical treatment to include "[w]hatever is usually done to the patient or administered to him by a skilled physician or surgeon" and "also all of the things performed by a doctor or a surgeon on the body of the patient in the diagnosis of or in preparation for cure").  Accordingly, Plaintiff urges the court to find that Mr. Dorsey's decision to inject Rolaids into his parenteral port was not medical treatment within the meaning of his accidental death policy's exclusions.

In arguing the contrary, Defendant relies on several cases from other jurisdictions that uphold application of a medical treatment exclusion in cases where the insured died while taking medication.  *See Swisher-Sherman v. Provident Life & Accident Ins. Co.*, 37 F.3d 1500 (6th Cir. 1994); *Pickard v. Transamerica Occidental Life Ins. Co.*, 663 F. Supp. 126 (E.D. Mich. 1987); *Reid v. Aetna Life Ins. Co.*, 440 F. Supp. 1182 (S.D. Ill. 1977).  But in each of those cases the decedent was administered the fatal substance at the direction of a doctor or as part of a particular medical

procedure.  Not one of those cases stands for the proposition that the term "medical treatment" includes an insured's unprompted decision to ingest a substance to "self-medicate" without any involvement whatsoever of a medical professional.

Nonetheless, Defendant argues that the medical treatment exclusion should apply to any action taken by an insured (even without the involvement of a medical professional) to alleviate a disease (which Defendant would have the court define as any "deviation from the healthy and normal functioning of the body" (Doc. 33 at 10)).  The court cannot accept such a broad definition.  What if a morbidly obese individual decided to take up jogging in order to achieve a healthier weight? Would the medical treatment exclusion apply when that individual was struck by a car while out on a run?  After all, morbid obesity is a "deviation from the healthy and normal functioning of the body," *i.e.*, a disease.  And the individual was only running in an attempt to treat that disease.  The interpretation of medical treatment Defendant would have the court adopt leads to absurd results, and there is no authority that supports it.  Accordingly, the court finds, at least on this record, that the medical treatment exclusion in Mr. Dorsey's accidental death policy does not encompass his unprompted decision to self-treat his heartburn without any involvement of a medical professional.

### 3. The drug exclusion does not apply

Defendant also claims its denial of Plaintiff's claim was justified under the policy's drug exclusion, which excludes any injury that "occurs while the Covered Person is taking or using any narcotic, barbiturate, or any other drug, unless taken or used as prescribed by a physician."  (Doc. 33 at 2).  The crucial question here is whether a Rolaids tablet comes within the meaning of the term "any other drug."

Defendant contends that the definition of "any other drug" is unambiguous based on broad definitions of "drug" found in several dictionaries and a case of the Georgia Court of Appeals. *See Guest v. Horace Mann Ins. Co.*, 310 S.E.2d 241 (Ga. Ct. App. 1983). In doing so, however, Defendant admittedly urges this court to adopt a "broad definition[]" of the term. (Doc. 33 at 11). But the Alabama Supreme Court has held that an exclusion in an insurance policy is ambiguous if it is "reasonably susceptible to two or more constructions or there is reasonable doubt as to [its] meaning." *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 308-09 (Ala. 1999).

Applying the rule of *ejusdem generis*, the court finds that the term "drug" as used in Mr. Dorsey's policy is ambiguous.[3] According to the Alabama Supreme Court, that rule "ordinarily limits the meaning of general words and things to the class or enumeration employed." *Bly v. Auto Owners Ins. Co.*, 437 So. 2d 495, 497 (Ala. 1983)(applying *ejusdem generis* to limit the scope of an exclusion in an insurance policy). The drug exclusion Defendant invokes in support of its denial of Plaintiff's claim does not merely exclude injuries that occur while the insured is taking a "drug"; it excludes injuries that occur while taking "any narcotic, barbiturate, or any other drug, unless taken or used as prescribed by a physician." When the language "any other drug" is properly considered in context, *ejusdem generis* indicates that the drug exclusion in Mr. Dorsey's policy only applies to drugs in the same class as narcotics and barbiturates, or at most drugs that are dispensed by

---

[3]Defendant's best argument that the drug exclusion should apply to situations where an insured misuses a readily-available substance like Rolaids is based on *Guest v. Horace Mann Ins. Co.*, 310 S.E.2d 241 (Ga. Ct. App. 1983). That case held that a drug exclusion in an accidental death policy was applicable when the insured died as a result of taking three separate over-the-counter cold medications. *Id.* at 242. But the policy at issue in that case simply excluded death resulting from "drugs, unless prescribed by a physician voluntarily taken." *Id.* Furthermore, unlike the exclusion at issue here, there was no enumeration of specific drugs to trigger the rule of *ejusdem generis*. As a result, the *Guest* decision is distinguishable, and the court does not find its conclusion applicable here. *Id.* at 243.

-10-

prescription.  Nothing submitted to the court indicates that Rolaids tablets belong in that class of drugs.  Indeed, Plaintiff has even submitted evidence that James King, the employee of Defendant who was responsible for Plaintiff's claim, did not believe the drug exclusion applied to misuse of Rolaids because that drug does not require a prescription.  (Doc. 21 at 21).  Based upon the analysis above, the court concludes that the drug exclusion is reasonably susceptible to a construction that does not encompass Rolaids tablets, and, therefore, the definition of "any other drug" is ambiguous.

With the ambiguity in the term "any other drug" thus identified, the court is required to interpret that ambiguity against Defendant.  *See Blackburn v. Fidelty & Deposit Co.*, 667 So. 2d 661, 669 (Ala. 1995) (stating "because the language of the insuring clause does not clearly limit the policy's coverage to Defendant's own narrow interpretation, it cannot be construed to deny [plaintiff] coverage").  Although Defendant has asked this court to construe the drug exclusion "broad[ly]" (Doc. 33 at 11), Alabama law requires that "[a]ny exceptions from coverage present in an insurance policy are construed narrowly, so as to provide maximum coverage for the insured."  *Blackburn*, 667 So. 2d at 669.  Accordingly, the court agrees with Plaintiff's narrow interpretation of the drug exclusion and finds that Defendant cannot rely on the drug exclusion to justify its denial of Plaintiff's claim.

### B.    Bad Faith Claim

Count II of the Complaint states a claim for the tort of bad faith.  In Alabama, the tort of bad faith comes in two varieties—ordinary and extraordinary.  Both types share certain elements in common:  "(1) the existence of an insurance contract between the parties; (2) an intentional refusal to pay the insured's claim; and (3) the insured's contractual entitlement to payment of the claim."  *Preis v. Lexington Ins. Co.,* 508 F.Supp.2d 1061, 1077 (S.D. Ala. 2007) (citing *State Farm Fire &*

*Casualty Co. v. Slade,* 747 So.2d 293, 316–18 (Ala. 1999)).  However, even though ordinary and

extraordinary bad faith claims share these common elements, they are in fact separate and distinct

from one another, and it is possible to succeed on one while failing on the other.  For the reasons

discussed below, the court concludes that Plaintiff has not presented substantial evidence in support

of her ordinary bad faith claim, but has presented substantial evidence in support of her extraordinary

bad faith claim.

       **1.**       **Summary judgment is due on the ordinary bad faith claim**

       A plaintiff hoping to prevail on an ordinary bad faith claim against an insurance company

must prove four elements: 1) breach of an insurance policy by an insurer, 2) the insurer's intentional

refusal to pay the insured's claim, 3) the lack of a "reasonably legitimate or arguable reason for the

refusal (the absence of a debatable reason)" and 4) actual knowledge on the part of the insurer of the

lack of any legitimate or arguable reason.  *Grissett v. Employee Benefits Ass'n*, 732 So. 2d 968, 976

(Ala. 1998).  The court has already concluded that Plaintiff has presented substantial evidence that

Defendant breached Mr. Dorsey's insurance policy.  But as to the second and third element, the court

need not make a determination because Plaintiff has not presented substantial evidence in support

of the fourth–Defendant's actual knowledge of the lack of any legitimate or arguable reason for its

denial of benefits.

       To argue otherwise Plaintiff claims that "because [Defendant] had *Couch on Insurance* in

its possession and had been a party to the *Brooks* case . . ., [Plaintiff] presented substantial evidence

that [Defendant] knew that it had no reason to deny Mrs. Dorsey's claim."  (Doc. 36 at 23).  Yet

Plaintiff also has submitted evidence that no one ever looked at those sources while investigating

her claim.  Plaintiff may argue that failure to consult those sources was "bad judgment or negligence,

but more than bad judgment or negligence is required in a bad-faith action." *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 286-87 (Ala. 2005). Nor does Plaintiff present evidence that anyone involved in her claim had actual knowledge of the *Brooks* case; she only claims that King and Caldwell were employees of J.C. Penny Life Insurance Company at the time that case was litigated.

At best, Plaintiff has asserted only that Defendant *should have* consulted *Couch* and Westlaw, and *should have* known there was no legitimate or arguable reason to apply the medical treatment exclusion. But that is not enough. She must present substantial evidence that Defendant *actually* had such knowledge. Indeed, all the evidence Plaintiff has submitted indicates that Defendant did not have that requisite knowledge. Accordingly, Plaintiff's ordinary bad faith claim must fail.

## 2.    Plaintiff has presented substantial evidence of extraordinary bad faith

In contrast to its "ordinary" counterpart, the standard for extraordinary bad faith does not contain an actual knowledge requirement. Accordingly, Plaintiff's claim for bad faith may still succeed despite this court's Rule 56 finding that her ordinary bad faith claim is due to be dismissed on summary judgment. A case of extraordinary bad faith "can consist of: 1) intentional or reckless failure to investigate a claim; 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review; 3) the manufacture of a debatable reason to deny a claim; or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim." *Singleton v. State Farm Fire & Cas. Co.*, 928 So.2d 280, 283 (Ala. 2005). The portions of the policy Defendant relied on to deny Plaintiff's claim are ambiguous, so, at least on this record, the facts of this case fit into the fourth category of extraordinary bad faith.

In order to prevail on a claim for extraordinary bad faith, Plaintiff must show that "(1) the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 318 (Ala. 1999). As discussed above, Plaintiff has presented substantial evidence that Defendant breached the insurance contract, so the only remaining question is whether there is substantial evidence that Defendant "failed to properly investigate the claim" or failed to subject the results of the investigation to a "cognitive evaluation and review."

The crux of Plaintiff's extraordinary bad faith claim is whether the Defendant subjected the results of its investigation to a cognitive evaluation and review.[4] Here, Plaintiff has presented substantial evidence that Defendant's cognitive evaluation of her claim did not adequately consider whether the medical treatment exclusion applied before it denied her claim. It is undisputed King did not think it was necessary to determine whether what Mr. Dorsey did was considered medical or surgical treatment before invoking the exclusion. Although *Couch on Insurance* and Westlaw were available, neither King nor Caldwell looked to those sources to determine the meaning of "medical treatment." King never even looked in the dictionary to define the words "medical" and "surgical." And although Caldwell did seek an opinion from the legal department on Plaintiff's

---

[4]Plaintiff has not presented substantial evidence that Defendant failed to properly investigate her claim. In reviewing her claim, Defendant looked at Mr. Dorsey's death certificate, the Coroner's report, and the statement Plaintiff submitted. Because Defendant accepted all that information as true, Plaintiff cannot complain that Defendant did not have all the necessary facts to evaluate her claim. Nor has Plaintiff presented a shred of authority to the court indicating that an insurance company acts in bad faith when it accepts a claimant's version of the facts as true. Accordingly, the court finds that even though Defendant's investigation apparently consisted only of accepting Plaintiff's version of the facts, such an investigation was all that was warranted under the circumstances.

claim, there is no evidence that communication addressed the medical treatment exclusion.

The Alabama Supreme Court has found that "an insurer's subjective belief that a portion of its insurance contract precludes coverage is not an absolute defense to a bad faith claim." *Blackburn v. Fidelity and Deposit Co. of Maryland*, 667 So.2d 661, 669 (Ala. 1995).  Here, Plaintiff has presented substantial evidence that Defendant did not perform any research or consult any authority in construing the medical treatment exclusions.  If Plaintiff is correct, it was nothing more than King and Caldwell's subjective belief that supported application of that exclusion. The *Blackburn* decision indicates that such a subjective belief is insufficient to meet the requirement of subjecting Plaintiff's claim to a cognitive evaluation and review.  Accordingly, the court finds Plaintiff has submitted substantial evidence in support of her claim for extraordinary bad faith.  This also is an issue for the trier of fact.

## IV.   CONCLUSION

For the foregoing reasons, the court finds that summary judgment is due to be granted on the counts of civil conspiracy and ordinary bad faith, but denied on the counts of breach of contract and extraordinary bad faith.

The court will issue an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this _____8th_____ day of August, 2011.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE